UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CASVILLE INVESTMENTS, LTD., MBC INVESTMENT, SA and WATKINS INTERNATIONAL, LTD., Individually and Derivatively on Behalf of Nominal Defendant ARGO DIGITAL SOLUTIONS, INC. | No. 12cv6968 (RA) ECF CASE |
| Plaintiffs, | VERIFIED DERIVATIVE COMPLAINT |
| -against- | |
| JASON M. KATES, RICHARD J. SULLIVAN, DAVID A. LOPPERT, WORLD CAPITAL MARKETS INC., SOLUTIONS, INC., RVUE HOLDINGS, INC. and JOHN DOES 1 – 20, | JURY TRIAL DEMANDED |
| Defendants, | |
| ARGO DIGITAL SOLUTIONS, INC. | |
| Nominal Defendant. | |

Plaintiffs Casville Investments, Ltd., MBC Investment SA and Watkins

International, Ltd., by and through their attorneys, Gusrae Kaplan Nusbaum PLLC,

complaining against defendants, allege and state as follows:

PRELIMINARY STATEMENT

1.      Plaintiffs are shareholders and investors in Argo Digital Solutions, Inc.

("Argo Digital" or the "Company"), a now defunct technology company.  Defendants

engaged in an extensive, pre-meditated common plan, scheme and contrivance to (i)

illegally obtain control of Argo Digital through massive dilution of plaintiffs' equity

ownership, (ii) use that control to strip the Company of its assets and transfer them to a

publicly traded shell company, defendant rVue Holdings, Inc. ("rVue Holdings"), also

under defendants' control; (iii) upon information and belief, artificially manipulate the

price of rVue Holdings' common stock, and (iv) upon information and belief, illegally obtain and sell non-legended and free trading stock of rVue Holdings all in violation of the Federal Securities Laws.

2.     The purpose of these transactions, upon information and belief, was, through an illegal contrivance, to create rVue Holdings as a debt-free publicly traded company under defendants' control and in which defendants could illegally sell stock in violation of the Federal Securities Laws.  As part of defendants' common plan and scheme, defendants orchestrated the fraudulent transfer of the Company's assets (but not its liabilities) to rVue Holdings without fair consideration.  rVue Holdings ended up with substantially the same business, assets and management as Argo Digital, enriching defendants and injuring plaintiffs and the other shareholders of the Company while the Company received certain stock in rVue Holdings that was doled out to defendants and others.  As a byproduct of their scheme, defendants left the Company saddled in debt, devoid of operating assets and in liquidation.

3.     Upon information and belief, certain of the defendants (including certain John Does 1-20) surreptitiously and without disclosure to plaintiffs or the other shareholders of the Company or rVue Holdings, obtained "free trading" shares of the rVue Holdings shell company prior to the transactions alleged herein and these defendants subsequently sold such shares into the public markets.  These securities transactions represent multiple violations of the Federal Securities Laws, including that the alleged "free trading" shares were really restricted shares and should have contained a restrictive legend once defendants obtained such shares.  The defendants, upon information and belief, illegally and artificially manipulated the price of the rVue

2

Holdings shell company stock by not distributing stock in rVue Holdings to the Company's shareholders therefor dominating and controlling the public market for the shell.  As a result of defendants' misconduct, the market price of the shell stock went up to as high as $2.00 for a share of stock.  As part of their common plan and scheme, once defendants sufficiently manipulated the price of rVue Holdings shares on the public market, defendants, upon information and belief, then directly and through proxies sold this "free trading" stock into the market for a substantial and wrongful profit.

4.      In summary, defendants and their unnamed co-conspirators, upon information and belief, engaged in a "pump and dump" scheme in violation of the Federal Securities Laws in which defendants, among other misconduct, (i) obtained and manipulated unchecked management control of the Company to usurp its assets for their own benefit; (ii) without disclosure obtained large amounts of "free trading" stock of rVue Holdings, a shell company; (iii) artificially manipulated the price of rVue Holdings stock by, among other things, fraudulently transferring the Company's assets to rVue Holdings for inadequate consideration; and (iv) then illegally sold their rVue Holdings stock into the public markets.  Defendants' "pump and dump" scheme, upon information and belief, violated plaintiffs' and the Company's corporate rights and also violated the registration and disclosure requirements of the Federal Securities Laws.

5.      While defendants, upon information and belief, reaped significant and wrongful rewards, Argo Digital was left insolvent and without a business.  By this action, plaintiffs seek damages for themselves and damages derivatively on behalf of the Company to redress defendants' breaches of fiduciary duty, self-dealing, waste of corporate assets, fraudulent conveyances and unjust enrichment.

<u>JURISDICTION AND VENUE</u>

6.      This action is brought for claims under the common law of the State of

Delaware.  This Court has diversity jurisdiction over these claims, pursuant to 28 U.S.C.

§ 1332, in that the plaintiffs and defendants are citizens of different states and/or foreign

states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.      Venue is proper in this District, pursuant to 28 U.S.C. §§ 1391(a) and

1401 because a substantial part of the events and omissions giving rise to the claims

occurred in this District.  Defendants, upon information and belief, retained corporate

counsel and other professionals in New York that assisted defendants in structuring the

fraudulent conveyances and related transactions, and these transactions occurred in

New York.

<u>PARTIES</u>

8.      Plaintiff Casville Investments, Ltd. ("Casville Investments") is a corporation

organized under the laws of the British Overseas Territory of Gibraltar with a principal

office located there, is engaged in the business of making investments and is a

shareholder of Argo Digital.

9.      Plaintiff MBC Investments, SA ("MBC Investments") is a corporation

organized under the laws of Switzerland with a principal office located in Fribourg,

Switzerland, is engaged in the business of making investments and is a shareholder of

Argo Digital.

10.     Plaintiff Watkins International, Ltd. ("Watkins Int'l") is a corporation

organized under the laws of the Republic of Panama with a principal office located in

Panama City, Panama, is engaged in the business of making investments and is a shareholder of Argo Digital.

11.    Nominal defendant Argo Digital Solutions, Inc. is a corporation organized under the laws of Delaware with a principal office located at 100 N.E. 3rd Avenue, Ste. 200, Fort Lauderdale, Florida 33301.  Prior to in or around March 2009, Argo Digital was known as RMS Networks, Inc.  Argo Digital designed, developed and sold digital advertising and marketing solutions, focusing on designing and implementing digital media marketing networks using its rVue software for "Out of Home" marketing environments, such as retail stores, automotive dealerships, restaurants, doctor's offices, and movie theaters.  In or around May 2010, defendants caused Argo Digital for inadequate consideration to transfer out of Argo all of the issued and outstanding stock of its operating subsidiary, rVue, Inc., and all other assets related to the rVue business (the "Fraudulent Conveyance").  After the Fraudulent Conveyance to defendant rVue Holdings, defendants began the process of winding up Argo Digital and created a liquidating trust, allegedly for the purpose of distributing the Company's rVue Holdings stock and any remaining assets of Argo Digital.  As set forth below, the liquidating trust was in reality a personal piggyback for certain of the defendants to wrongfully purloin large amounts of rVue Holdings stock allegedly intended for the benefit of plaintiffs and the Company and its other shareholders.

12.    rVue Holdings, Inc., upon information and belief, is a corporation organized under the laws of Nevada with a principal office located at 100 N.E. 3rd Avenue, Ste. 200, Fort Lauderdale, Florida 33301, and prior to in or around March 2010, was known as Rivulet International, Inc.  From at least in or around June 2009

until the Fraudulent Conveyance, rVue Holdings was a "shell company" as that term is defined under Federal Securities Laws with nominal or no assets and operations.  Upon the Fraudulent Conveyance, rVue Holdings exited "shell company" status, spun off its prior assets and liabilities to a new company owned by its prior shareholders and is now engaged in the digital advertising and marketing business formerly owned by Argo Digital.

13.     Defendant Jason M. Kates ("Kates"), upon information and belief, at all times relevant was the Chief Executive Officer, President and a Director of Argo Digital; from the closing of the Fraudulent Conveyance to on or about April 30, 2012 was the Chief Executive Officer, President and Chairman of the Board of rVue Holdings; and resides in Fort Lauderdale, Florida.

14.     Defendant Richard J. Sullivan ("Sullivan"), upon information and belief, at all times relevant, was the Chairman of the Board of Directors and a financial consultant to Argo Digital; was a Director of rVue Holdings from the closing of the Fraudulent Conveyance to on or about August 27, 2010 when Sullivan was removed by written consent of a two-thirds majority of shareholders of rVue Holdings; is the Founder, a Director, Chief Executive Officer, President and the majority shareholder of defendant World Capital Markets, Inc. ("World Capital"); is the Founder, President, Secretary, Chairman and controlling shareholder of defendant Solutions, Inc. ("Solutions"); and resides in West Palm Beach, Florida.  Upon information and belief, Kates along with Sullivan and John Does 1-20 were the masterminds behind the "pump and dump" scheme and other illegal conduct alleged herein which benefited defendants at the expense of plaintiffs and the Company and its other shareholders.  Kates, upon

information and belief, brought in Sullivan as a consultant and director because of Sullivan's alleged experience in shell company transactions so that Kates and Sullivan could mastermind the "pump and dump" scheme and market manipulation of the stock.

15.     Defendant David A. Loppert ("Loppert"), upon information and belief, at all times relevant, was the Senior Vice President of Finance for Argo Digital; from the closing of the Fraudulent Conveyance to on or about June 19, 2012 was the Chief Financial Officer, Secretary and Treasurer of rVue Holdings; was a business associate and partner of Sullivan; and resides in Palm Beach Gardens, Florida.

16.     Defendant World Capital Markets, Inc., upon information and belief, is a corporation organized under the laws of Florida, with a principal office located at 777 S. Flagler Drive, Suite 800, West Palm Beach, Florida 33401; and is engaged in the business providing consulting services for private companies interested in becoming publicly traded and raising capital.

17.     Defendant Solutions, Inc., upon information and belief, is a corporation organized under the laws of Delaware with a principal office located at 777 S. Flagler Drive, Suite 800, West Palm Beach, Florida 33401; and is engaged in the business of consulting concerning mergers and acquisitions and assisting clients with various aspects of their business, including formulating and implementing acquisition objectives, conducting sales and divestitures, issuing private placements of equity and debt and becoming publicly traded.  World Capital and Solutions, upon information and belief, are affiliates and were controlled, in whole or in part, by Sullivan and Loppert.

## DEFENDANTS' DUTIES

18.     Defendants Kates and Sullivan, upon information and belief, comprised the Board of Directors of Argo Digital from 2008 through 2010 which is the time period of the "pump and dump," the market manipulation of the rVue Holding's stock and the massive dilution of the Company stock and Fraudulent Conveyance complained of herein.

19.     Defendants Kates, Sullivan and Loppert (collectively the "Individual Fraud Defendants"), upon information and belief, at all relevant times, had management control of Argo Digital, World Capital and Solutions (World Capital and Solutions are collectively referred to as the "Entity Fraud Defendants"), and management control of rVue Holdings.  Defendants, upon information and belief, as a group at all relevant times, controlled Argo Digital and with the assistance of unnamed John Doe defendants, orchestrated, directed and performed the "pump and dump," market manipulation, dilution of the Company stock and Fraudulent Conveyance complained of herein.

20.     The Individual Fraud Defendants collectively constituted a control group of the Company through their managerial power and agreement to engage in a common plan and scheme to dilute plaintiffs' stock holdings, usurp control of the Company and carry out the Fraudulent Conveyance as well as to create a "pump and dump" artifice with rVue Holdings to artificially manipulate its common stock and sell the stock to investors at higher prices all in violation of the Federal Securities Laws and to enrich themselves at the expense of plaintiffs and the Company and its other shareholders.

21.     By reason of their positions as officers, directors, and/or fiduciaries of Argo Digital and because of their ability to control the business and corporate affairs of Argo Digital, the Individual Fraud Defendants owed Argo Digital and its shareholders, including plaintiffs, fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to manage Argo Digital in a fair, just, honest and equitable manner. The Individual Fraud Defendants were and are required to act in furtherance of the best interests of Argo Digital and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of Argo Digital owes to Argo Digital and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of Argo Digital and in the use and preservation of its property and assets, and the highest obligations of fair dealing and full disclosure.

22.     The Individual Fraud Defendants, because of their positions of control and authority as directors and officers of Argo Digital, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Each of the Individual Fraud Defendants not only had knowledge of the misconduct alleged herein because of their advisory, executive, managerial, and directorial positions with Argo Digital, but also actively participated in, among other violations of Federal Securities Laws, artificially manipulating the price of rVue Holdings stock and illegally selling undisclosed restricted securities.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

23.     Plaintiffs were shareholders at the time of the transactions complained of or their share ownership later devolved on by operation of law.

9

24.     The action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

25.     A pre-suit demand on the Argo Digital board of directors is futile, and therefore, excused.  This is because during the relevant time period of the Fraudulent Conveyance the Argo Digital board of directors, upon information and belief, consisted of Kates and Sullivan, and since 2010, when Sullivan left the board, Kates has been the only board member (the "Board").

26.     As set forth herein, the Board and the other defendants breached their fiduciary duties to plaintiffs and Argo Digital and enriched themselves at the expense of plaintiffs and the Company by conceiving of and intentionally carrying out the wrongful scheme leading to the Fraudulent Conveyance.  Consequently, Kates faces a substantial risk of liability for breach of good faith and loyalty, rendering him unable to fairly and objectively evaluate a pre-suit demand.  Kates, upon information and belief, also is concerned about his numerous violations of the Federal Securities Laws coming to light during any such litigation, and, accordingly, is conflicted by his own self-interests, once again, and cannot be counted upon to objectively evaluate a pre-suit demand.

27.     The Board, having ratified the wrongful acts complained of herein as part of a common plan and scheme to enrich themselves at the expense of plaintiffs and the Company and its shareholders, have demonstrated their unwillingness or inability to act in compliance with their fiduciary obligations and could not be expected to sue themselves or their fellow co-conspirators.  The members of the Board are not able to,

and will not, prosecute any action to punish defendants, which include the members of the Board, their business partners and companies that they own or control.

28.     As particularized herein, to properly prosecute this lawsuit, the one or more Argo Digital directors would have to sue themselves and the other defendants, requiring them to expose themselves and their affiliates to civil liability. This they will not do.

29.     The members of the Board have benefitted, and will continue to benefit, from the wrongdoing herein alleged, have engaged in such conduct to reap ill-gotten gains, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

30.     The Fraud Defendants and their affiliates and unnamed co-conspirators, upon information and belief, have and will continue to sell shares of rVue Holdings into the market as well as artificially manipulate the price of the common stock of rVue Holdings and the prosecution of this lawsuit would be expected to negatively impact their ability to do so.

31.     For these reasons, demand on the Board is futile, and therefore, excused.

<u>FACTUAL BACKGROUND</u>

I.      DEFENDANTS FRAUDULENTLY ENRICHED THEMSELVES AT THE EXPENSE OF ARGO DIGITAL AND ITS SHAREHOLDERS

A.      Kates Conceals and Misrepresents his Persistent Failure <u>to Grow the Business of Argo Digital</u>

32.     During more than a nine-year period from in or around June 1999 to May 2008, Casville Investments invested more than $750,000 in Argo Digital through a series of investments in both common stock and convertible preferred stock, all of which was subsequently converted to common stock in or around April 2007.  By in or around

the end of 2008, Casville Investments' ownership interest in Argo Digital represented approximately 11.5% of the voting and equity interest of Argo Digital.

33.     Due to the significant size of its investments in Argo Digital, during most of the nine-year period, Casville Investments possessed substantially more voting and equity interest in Argo Digital than other shareholders.

34.     In order to safeguard its considerable investment, Casville Investments attempted to participate significantly in and receive substantial disclosure of the actions of Kates and the other senior management, and the Board of Directors (the "Board") with respect to the daily operations and strategy of Argo Digital.  For example, from in or around April 2002 to June 2007, Marco Arese ("Arese"), a principal of Casville Investments, held a seat on the Board.

35.     Kates, as Chief Executive Officer and Chairman, failed to maintain corporate formalities required under Delaware corporate law.  Kates held only sporadic Board and shareholder meetings.

36.     For example, following many disagreements between Kates and Arese regarding Kates' failed leadership and ability to grow Argo Digital's business, in or around June 2007, without the prior receipt of any notice of an emergency shareholder or Board meeting or any written shareholder or Board consents, Kates summarily ousted Arese from the Board.  Kates, under information and belief, removed Arese from the Board in retaliation for Arese pressing Kates for better results in the Company's business.

37.     Kates sent overly optimistic communications misrepresenting to shareholders and the Board his supposed successes in obtaining customer contracts,

securing additional financing and locating buyers for Argo Digital. Argo Digital continuously ran out of operating capital and needed continued assistance from its existing shareholder base. At these times, Kates would falsely tout his and the Company's recent efforts to induce further investment.

38.     For example, in or around February 2008, in order to attract support for Argo Digital's private offering of four million shares at $0.05 per share for "bridge financing," Kates touted a recent product placement initiative with AutoNation. Kates cited this relationship as the cause for Argo Digital's complete overhaul of its operations to focus on the automotive sector. After the offering had already attracted a number of investors, including Casville Investments, AutoNation canceled its contract with Argo Digital. Kates, upon information and belief, was fully aware at the time that the offering began that AutoNation would, or was likely to, terminate its contract and that Argo Digital's software product was not adequate to meet AutoNation's requirements.

39.     None of the new long-term customer relationships, strategic transactions or significant financings emphasized by Kates in various communications materialized, and by 2007, Argo Digital began to lose many of its customers. Kates, upon information and belief, knew or should have reasonably known that his communications to shareholders and the Board regarding the Company's business and prospects were false when made.

40.     In reliance on Kates' false statements, Casville Investments, among other shareholders, continued to invest in Argo Digital through 2008.

B.    Defendants Begin Efforts to Sell the
      Company's Assets for Their Personal Gain

41.    Kates, upon information and belief, recognized he would be unable to execute his attempted business plans, and sought an alternative, and wrongful, avenue to personally profit from the Company.

42.    A few months after the offering for "bridge financing," in or around the middle of 2008, Kates, upon information and belief, was introduced to Sullivan and Loppert, and the Individual Fraud Defendants, (together with Sullivan's companies World Capital and Solutions, collectively, the "Fraud Defendants"), began the first of many schemes to use Argo Digital and its assets to enrich themselves to the detriment of the Company's shareholders.

43.    In the first scheme, in or around September 2008, mere months after touting the renewal of Argo Digital as an advertising company focused on the automotive sector, Argo Digital retained World Capital, Sullivan's investment consultancy, as an adviser to assist Argo Digital in selling all or substantially all of Argo Digital's intellectual property assets.  World Capital prepared a September 2008 offering memorandum to sell the rVue Digital Signage Content and Distribution and Management System (the "rVue Software"), for a "permanent, paid-up license."

44.    In conjunction with the proposed sale of the rVue Software, Argo Digital and World Capital, in a September 29, 2008 press release, pledged to form a new company with an entirely new business plan: "to promote effective capital raising techniques through rich advertising, metrics, non-traditional advertising outlets and Internet-based social networks" for private and public companies.

45.    This scheme was a clear violation of Argo Digital's corporate governance documents and Delaware corporate law requiring majority shareholder approval for authorization to dispose of substantially all of the assets of the Company and reorganize the Company.

46.    Within a few months, the Fraud Defendants scrapped the plan to sell the rVue Software, apparently because World Capital was unable to find any buyers for the rVue Software.

C.    The Fraud Defendants Fraudulently Convey All Assets of Argo Digital to a Debt-Free Public Shell Company to the Detriment of Other Argo Digital Shareholders

47.    In or around early December 2008, the Fraud Defendants began their second scheme, the Fraudulent Conveyance.  The Fraud Defendants, upon information and belief, jointly devised and carried out this common plan and scheme to transfer all, or substantially all, assets of Argo Digital to a debt-free shell company which the Fraud Defendants controlled, leaving in the Company all liabilities.  To facilitate the Fraudulent Conveyance, the Fraud Defendants (i) obtained capital from new and existing shareholders for a purported plan to turn Argo Digital into a public company; (ii) unlawfully usurped the majority shareholdings and control of Argo Digital from existing shareholders, including plaintiffs, through massive dilution of the Company shares; and (iii) without fair consideration, issued vast amounts of the newly issued shares to defendants and their proxies.

1)  The Fraud Defendants Seek Financing for the Fraudulent Conveyance by Falsely Claiming that the Company Would Become a Public Company and Use its Freely Trading Shares to Acquire Digital Media Companies

48.    After the failure of the Fraud Defendants' first scheme to sell Argo Digital's assets, the Fraud Defendants reversed course, and through the Individual Fraud

15

Defendants, told Company shareholders that Argo Digital would implement a plan to become a public company, either via an initial public offering or through a reverse merger. Their stated purpose was to take advantage of opportunities to acquire small and medium sized digital advertising and marketing companies and use soon-to-be publicly traded shares of Argo Digital as consideration for the acquisitions. The Fraud Defendants, upon information and belief, conspired to abuse the public securities markets and take unfair advantage of plaintiffs and the other innocent shareholders of Argo Digital to create vast holdings of Company shares, not to use for acquisitions but to be transferred to the Fraud Defendants and their unnamed co-conspirators.

49.     In order to raise money supposedly for Argo Digital's "digital acquisition strategy," the Fraud Defendants attempted multiple offerings of Argo Digital common stock, first at $0.30 per share, more than six times the price of the early 2008 offering, and then at $1.00 per share, twenty times the price of the early 2008 offering. In or around June 2009, the Fraud Defendants offered the same opportunity at $1.00 per share to Argo Digital's existing shareholder base. In or around July 2009, the offering was amended to add warrants to purchase 10,000 shares at $0.10 per share along with 10,000 shares as a unit for $10,000.

50.     In each of these offerings, the Fraud Defendants tried to leverage the alleged experience of Sullivan, World Capital and Solutions as financial advisors and acquirers of companies and their alleged relationships with affiliated companies, such as Applied Digital Solutions and Accretive Exit Partners, a boutique private equity firm, to persuade potential investors to support their plans for the Company's "digital acquisition strategy."

51.     In or about March 2009, the Fraud Defendants induced Argo Digital shareholders to approve (i) a vague plan to take the company public, (ii) appointment of Sullivan as Chairman of the Board of Argo Digital; (iii) a change of the name of the company from RMS Networks, Inc. to Argo Digital Solutions, Inc.; and (iv) allocating 5,000,000 shares of Argo Digital, approximately a fifth of the then issued and outstanding stock for an employee stock option plan.

52.     The March 2009 offering materials emphasized a pre-IPO valuation of Argo Digital's intellectual property and other assets at an eye-popping $100 million to $125 million based on, among other things, a purported auction of such assets and recent IPO transactions for supposed competitors in the media industry.  The offering materials valued Argo Digital post-IPO at $433 million by the end of 2009 after acquisitions of other companies supposedly in negotiations with the Company.  These statements were clearly part of the so-called "pump."  In addition to these wildly exaggerated valuations and projections, the offering materials touted that "since Argo will grow at a faster rate than [comparable companies in the industry], it is not unreasonable to assume that Argo will achieve much higher multiples."  This also was part of the "pump."

53.     These valuations and projections, upon information and belief, diverged enormously from the actual financial condition of the Company and from the information which the Fraud Defendants had in their possession.  For example, the audited financial statements for 2007, provided by the Company's auditors in or around late April 2008, and unaudited financials for the first half of 2008, which were provided to shareholders in or around late July 2008, detailed an accumulated deficit of approximately $18

17

million.  As of April 22, 2008, the Company's auditors also opined that substantial doubt existed as to whether Argo Digital could continue as a going concern at all due to the company's accumulated deficit and loss of major customers.

54.     The offering materials provided to shareholders and investors also contained false statements regarding actions taken by the Company.  For example, in a June 24, 2009 letter to shareholders, Kates stated that Arese had accepted a position as "Non-Executive Chairman, Europe" on Argo Digital's management team.  In actuality, Arese had never been contacted by Argo Digital about this appointment and had no agreement with Argo Digital to act in such a role.  Kates, in the same letter to shareholders, also claimed that Argo Digital had entered an agreement to acquire the assets and intellectual property rights of a mobile marketing company.  In subsequent shareholder communications, Argo Digital never described this transaction, and, upon information and belief, no such agreement existed.  In addition, in correspondence dated June 23, 2009, Kates states that Argo Digital had "started the process of becoming a public company" and expected to file "in the next few weeks" or "by month end" a Form 10 registration statement, and that upon filing, existing shares would be registered.  No Form 10 registration statement was ever filed, and in any event, under applicable Federal Securities Laws, existing Argo Digital shares would have remained restricted after an effective Form 10 registration statement.

55.     Moreover, although World Capital Markets has never been registered as a broker-dealer under Section 15 of the Securities Exchange Act, World Capital Markets made offers and, upon information and belief, sales as the "exclusive agent" for Argo Digital and "primary contact" in connection with one or more of the offerings.

56.     Not surprisingly given the state of Argo Digital's financial condition, the Fraud Defendants' offerings, upon information and belief, failed to garner substantial interest from new or existing shareholders.  Any funds raised, upon information and belief, were spent by the Fraud Defendants on continued unsuccessful efforts to sell the Company.

2) The Fraud Defendants Usurp Control
   of the Company Through Massive Share Dilution

57.     In or about December 2008, the Fraud Defendants solicited Company shareholders to approve an increase in the number of authorized shares of the Company from 25,000,000 to 250,000,000 shares.  The Fraud Defendants falsely stated that the increase in shares was necessary to recapitalize the Company as part of a going public transaction.  In other communications, the Fraud Defendants stated such a going public transaction would minimize dilution of pre-existing shareholders, such as plaintiffs.

58.     The Fraud Defendants, upon information and belief, intentionally misstated their true intent to Argo Digital shareholders.  The Fraud Defendants, under information and belief, intended to abuse their positions with the Company and misappropriate large quantities of stock without adequate consideration to usurp shareholder control of the Company.

59.     Simultaneous with their attempts to raise capital by offering shares to new and existing shareholders, during 2009, the Fraud Defendants issued more than 100 million of the newly authorized shares to themselves and affiliated entities, giving themselves super-majority control for all corporate actions and allowing them to approve

the Fraudulent Conveyance by written consent without any notice to, or vote by, any other Argo Digital shareholders.

60.     As of in or around December 2008, approximately 22.7 million shares of Argo Digital common stock were issued and outstanding.  By in or around July 2009, Argo Digital had issued and outstanding common stock of more than 160 million shares. This more than seven-fold dilution of Argo Digital's capital stock is attributable to shares the Fraud Defendants issued to themselves and affiliates.

61.     According to a Schedule of Shareholders sent to Arese in late 2009, Kates' share ownership skyrocketed from approximately 4 million shares to approximately 60 million shares (18.18% to 37.75%) in the period from December 31, 2008 to December 1, 2009.  Similarly, Sullivan and his affiliated companies World Capital Markets and Solutions collectively held no shares at the end of 2008, but as of December 1, 2009, held approximately 61 million shares (38.13%).  Loppert held no Company shares at the end of 2008, but as of December 1, 2009, held approximately 5.5 million shares (3.44%).

62.     The Fraud Defendants simply could not have amassed, and did not amass, such large blocks of shares as valid consideration for performance of services. The Fraud Defendants, upon information and belief, did not pay for the shares, let alone pay $120 million for the shares, the applicable price applying the Fraud Defendants' valuation of $1 per share. The Fraud Defendants failed to disclose the circumstances or consideration for their share acquisition.  Notably, although roughly 52 million shares were held by Solutions at the end of 2009, none of the offering materials or shareholder

communications describe any engagement of Solutions by Argo Digital for any services whatsoever.

   3)  The Fraud Defendants Proceed With the Fraudulent
       Conveyance of All Assets of Argo Digital to a Public Shell Company

   63.    As a result of their wrongful dilution and usurpation of Company shares, the Fraud Defendants' percentage share ownership increased from approximately 18 percent at the end of 2008 to approximately 80 percent at the end of 2009.  At the same time, plaintiffs' share ownership dropped from approximately 12 percent to less than 2 percent.  Firmly in control of the majority voting interest of Argo Digital, starting at the end of 2009, the Fraud Defendants proceeded with their common plan and scheme for the Fraudulent Conveyance of all of Argo Digital's assets into a debt-free public shell company controlled by them.

   64.    In or around October 2009, the Fraud Defendants began informing certain shareholders that as a result of the debt issues of Argo Digital, Argo Digital would spin-out (the "Spin-Out") its largest and most valuable asset and business, the rVue Software, into rVue, Inc., "an entity that has no prior business encumbrances and has a clean balance sheet" in a tax-free transaction. The Fraud Defendants claimed that shares of rVue, Inc. would be distributed pro rata to all shareholders of Argo Digital and then rVue, Inc. would become public by reverse merger with a public shell company.

   65.    Through these discussions regarding the Spin-Out, in or around November 2009, Arese discovered the massive dilution of Casville Investments' percentage ownership in Argo Digital from about 12% to about 1.5% as a result of Kates' and Sullivan's share issuances to themselves and their affiliates.  Arese, on behalf of Casville Investments, fervently protested the seven-fold dilution.  Amazingly,

21

the Fraud Defendants solicited Casville Investments to invest more money in Argo Digital to offset the dilution perpetrated by the Fraud Defendants.  Having little choice, Casville Investments made an additional investment of more than $30,000 in Argo Digital to purchase back half of its diluted percentage share ownership and received warrants to purchase the other half.  At or around the same time, Casville Investments transferred a portion of its holdings of Company shares to the other plaintiffs.

66.     By late November 2009, the Fraud Defendants announced further changes to the Company's plans for the Spin-Out.  The Fraud Defendants stated that as part of the reverse merger, they would be conducting a private placement for shares in the public shell company.  The private placement would further dilute plaintiffs' and the other Company shareholders' alleged ownership in the new company.  The Fraud Defendants, as they had previously done, solicited further investment from Argo Digital shareholders to offset this announced dilution.

67.     In or around late March 2010, although no public shell company had been identified and no shares of rVue, Inc. had been distributed to Argo Digital shareholders, the Fraud Defendants used their unlawfully acquired majority interest share in the Company to consent to the Fraudulent Conveyance.  The Fraud Defendants approved the plan for Argo Digital to "sell" all of the shares of rVue, Inc. held by Argo Digital and all other Argo Digital assets to a public shell company.  In exchange, the Company would receive shares of an otherwise empty shell company.

68.     By a March 23, 2010 shareholder letter, the Fraud Defendants disclosed to Company shareholders that the Fraudulent Conveyance had been approved by consent and without a shareholder meeting.  Contrary to their previous statements

22

regarding the distribution of rVue, Inc. shares to the Company's shareholder, the Fraud Defendants explained that Argo Digital shareholders would not receive rVue, Inc. shares (these would be transferred directly by Argo Digital to the public company), but instead, Company shareholders would receive registered shares of the new public company one year after the transaction.

69.     The Fraud Defendants also disseminated a Private Placement Memorandum, dated as of March 23, 2010 ("PPM"), as part of their solicitation of Argo Digital shareholders and other potential investors to invest in the public shell company at a price of $0.40 per share, later reduced to $0.20 per share.  Upon information and belief, the defendants raised in excess of $800,000 in the private placement, selling shares in a company whose sole asset was Argo Digital's before the Fraudulent Conveyance.

70.     The PPM stated, among other things, that the transfer of all of Argo Digital's assets would be accomplished by the reverse merger of rVue, Inc. into the public shell and the Company would be left to liquidate without operating assets.  In exchange for the Company's assets and entire business, rVue Holdings, the new public company, would transfer its previously worthless shares to the Company to be held in a liquidating trust to first satisfy the Company's creditors.  The PPM further states that rVue Holdings would carry on the Company's business with the same management team led by the Individual Fraud Defendants.  The PPM also states the rVue Holdings shares to be issued to Argo Digital would be locked up for one-year (the "Lock-Up") by agreement of Argo Digital (i.e., by the shareholder consent of the Fraud Defendants).

71.     Plaintiffs refused to participate in the private placement for new public company shares.

72.     Within the next few months, the Fraud Defendants took the remaining key steps to complete the Fraudulent Conveyance and wrongfully become significant shareholders in the newly formed rVue Holdings:

- A public shell company, Rivulet International, Inc. ("Rivulet Int'l), was identified as the acquirer of rVue, Inc., and Rivulet Int'l changed its name to rVue Holdings, Inc.;

- Bridge financing through the issuance of bridge notes was obtained to allow Argo Digital to operate until the Fraudulent Conveyance;

- Employee agreements were entered into for employment of Kates and other employees of Argo Digital by rVue Holdings; and

- A stock options plan was approved for the issuance of options to rVue Holdings employees upon completion of the Fraudulent Conveyance.

73.     On or about May 13, 2010, the Fraudulent Conveyance transaction closed.  Kates (as President, Chief Executive Officer, and Director), Sullivan (as Chairman of the Board) and Loppert (as Chief Financial Officer, Secretary and Treasurer) took control of rVue Holdings.

74.     The Individual Fraud Defendants, upon information and belief, caused rVue Holdings to issue themselves options for rVue Holdings shares at strike prices far below market value, as follows:  Kates received options for 1.3 million shares; Sullivan received options for 300,000 shares; and Loppert received options for 600,000 shares. In addition in 2010 alone, Kates received cash compensation of approximately $500,000.  The Individual Fraud Defendants, upon information and belief, also caused rVue Holdings to issue in excess of 2.3 million shares of its stock to defendants' unnamed co-conspirators that assisted in the Fraudulent Conveyance.

24

75.     Argo Digital was left with 12,500,000 shares of rVue Holdings (the "Fraudulent Conveyance Consideration"), valued by the Fraud Defendants at $0.20 per share.  Existing Argo Digital shareholders held shares in the Company with the only asset being the Fraudulent Conveyance Consideration that equaled approximately 50% of rVue Holdings' stock, but which could not be distributed or sold under the Lock-Up until approximately mid May 2011.

76.     In a June 3, 2010 shareholder letter, Kates told shareholders that Argo Digital would create a liquidating trust to hold the Fraudulent Conveyance Consideration until the shares would be distributed to creditors and shareholders after the Lock-Up.  At or around the same time, Kates distributed to plaintiffs a chart representing their estimated share after the payment of all debts of Argo Digital.  Plaintiffs were to receive 202,266 shares from the Fraudulent Conveyance Consideration, representing a mere 1.6% percentage ownership in the Fraudulent Conveyance Consideration received by Argo Digital.

77.     With no reason given, months before the Lock-Up was supposed to terminate, the Lock-Up duration was extended to September 12, 2011.

78.     Despite the Lock Up prohibiting any recovery by plaintiffs or other Argo Digital shareholders, the Individual Fraud Defendants, upon information and belief, on or about December 14, 2010 caused Argo Digital to transfer 2,284,546 rVue Holdings shares from the Fraudulent Conveyance Consideration to Kates to satisfy alleged past debts due.

79.     Kates, upon information and belief, on or around December 28, 2010 also purchased from the Company an additional 800,000 rVue Holdings shares from the

balance of the Fraudulent Conveyance Consideration for a stated purchase price of $160,000 -- a price significantly below the then market price of approximately $1.20 per share for publicly traded rVue Holdings stock.

80.   According to rVue Holdings' 2011 annual report on SEC Form 10-K, Argo Digital held only 1,304,546 rVue Holdings' shares as of March 30, 2012.

81.   The Fraud Defendants and their unnamed co-conspirators received millions of shares of rVue Holdings stock as part of the misconduct alleged herein. Upon information and belief, one of the central purposes of the Fraudulent Conveyance was to provide them with this stock that they sold on the open market for millions of dollars of wrongful gains.

82.   Years after the Fraudulent Conveyance and months after the extended termination date of the Lock-Up period, plaintiffs have not received any portion of the Fraudulent Conveyance Consideration due after payment of Argo Digital's outstanding debt.

FIRST CAUSE OF ACTION
(Derivatively Against the Individual Fraud Defendants for Breach of Fiduciary Duty)

83.   Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 82 above, as if the same were fully set forth herein.

84.   Plaintiffs bring this cause of action derivatively on behalf of Argo Digital against the Individual Fraud Defendants for their breaches of fiduciary duty.

85.   Each of the Individual Fraud Defendants owes or owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Argo Digital's business and affairs.

86.     The Individual Fraud Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breaches of the fiduciary duties they owed to the Company. The Individual Fraud Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Argo Digital.

87.     As further set forth above, in breach of their fiduciary duties owed to Argo Digital, the Individual Fraud Defendants wasted and usurped the Company's assets and willfully participated in a common plan and scheme to cause the Company to transfer its assets for inadequate consideration.  The misconduct of each of the Individual Fraud Defendants renders him personally liable to the Company for breaching his fiduciary duties.

88.     As a direct and proximate result of the Individual Fraud Defendants' breaches of their fiduciary obligations, Argo Digital has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Fraud Defendants are jointly and severally liable to the Company for damages in an amount to be determined by the trier of fact, but no less than $5 million.

SECOND CAUSE OF ACTION
(Derivatively Against the Entity Fraud Defendants and rVue Holdings
for Aiding and Abetting Breach of Fiduciary Duty)

89.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 88 above, as if the same were fully set forth herein.

90.     Plaintiffs bring this cause of action derivatively on behalf of Argo Digital against the Entity Fraud Defendants and rVue Holdings for aiding and abetting breach of fiduciary duties.

91.    As further set forth above, the Individual Fraud Defendants owe or owed fiduciary duties to the Company and breached their fiduciary duties by participating in a common plan and scheme to cause the Company to transfer its assets for inadequate consideration to rVue Holdings.

92.    As further set forth above, each of the Entity Fraud Defendants and rVue Holdings had knowledge of the Individual Fraud Defendants' fiduciary duties and knowingly and intentionally provided them with substantial assistance in carrying out the Fraudulent Conveyance and other wrongful conduct set forth herein.

93.    As a direct and proximate result of the Entity Fraud Defendants' and rVue Holdings' aiding and abetting the Individual Fraud Defendants' breaches of fiduciary duty, Argo Digital has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Entity Fraud Defendants and rVue Holdings are jointly and severally liable to the Company for damages in an amount to be determined by the trier of fact, but no less than $5 million.

## THIRD CAUSE OF ACTION
### (Derivatively Against the Defendants for Fraudulent Conveyance)

94.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 93 above, as if the same were fully set forth herein.

95.    Plaintiffs bring this cause of action derivatively on behalf of Argo Digital against the defendants for fraudulent conveyance.

96.    As further set forth above, defendants engaged in a common plan and scheme and performed the Fraudulent Conveyance which stripped the Company of its assets without fair or adequate consideration.

97.    As a direct and proximate result of the defendants' fraudulent conveyance, and/or aiding and abetting of a fraudulent conveyance, Argo Digital has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the defendants are jointly and severally liable to the Company for damages in an amount to be determined by the trier of fact, but no less than $5 million.

### FOURTH CAUSE OF ACTION
(Derivatively Against the Entity Fraud Defendants for Breach of Contract)

98.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 97 above, as if the same were fully set forth herein.

99.    Plaintiffs bring this cause of action derivatively on behalf of Argo Digital against the Entity Fraud Defendants for breach of contract.

100.    As set forth above, the Entity Fraud Defendants, upon information and belief, had contractual relationships with the Company to provide financial advisory and consulting services concerning alleged going public, recapitalization and finance related issues.

101.    As set forth above, the Entity Fraud Defendants breached their contractual and other duties to the Company and engaged in actionable misconduct.

102.    As a result of the Entity Fraud Defendants' breaches of contract, Argo Digital has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Entity Fraud Defendants are jointly and severally liable to the Company for damages in an amount to be determined by the trier of fact, but no less than $5 million.

29

## FIFTH CAUSE OF ACTION
### (By Plaintiffs Against the Individual Fraud Defendants for Breach of Fiduciary Duty)

103.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 102 above, as if the same were fully set forth herein.

104.    Plaintiffs bring this cause of action directly against the Individual Fraud Defendants for breach of fiduciary duty.

105.    As set forth above, the Individual Fraud Defendants breached their fiduciary duties and engaged in self-dealing in wrongfully diluting plaintiffs' stock holdings for defendants' wrongful gain.  The Individual Fraud Defendants, among other misconduct, exercised their majority or effective control to cause the Company to wrongfully issue excessive shares of its stock to the Individual Fraud Defendants and affiliated persons without fair or adequate consideration and providing lesser value, diluting plaintiffs' share ownership and constituting an improper transfer and expropriation of economic value and voting power from plaintiffs to the Individual Fraud Defendants and the Entity Fraud Defendants.

106.    As a direct and proximate result of the Individual Fraud Defendants' breaches of fiduciary duty and improper dilution, plaintiffs have sustained and continue to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Fraud Defendants are jointly and severally liable to plaintiffs for damages in an amount to be determined by the trier of fact, but no less than $5 million.

## SIXTH CAUSE OF ACTION
### (By Plaintiffs Against the Entity Fraud Defendants for Aiding and Abetting Breach of Fiduciary Duty)

107.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 106 above, as if the same were fully set forth herein.

108.    Plaintiffs bring this cause of action directly against the Entity Fraud Defendants for aiding and abetting breach of fiduciary duty.

109.    As further set forth above, each of the Entity Fraud Defendants had knowledge of the Individual Fraud Defendants' fiduciary duties and knowingly and intentionally provided them with substantial assistance in breaching these fiduciary duties by causing the Company to wrongfully issue excessive shares of its stock to the Individual Fraud Defendants and the Entity Fraud Defendants without fair or adequate consideration and providing lesser value, diluting plaintiffs' share ownership and constituting an improper transfer and expropriation of economic value and voting power from plaintiffs to the Individual Fraud Defendants.

110.    As a direct and proximate result of the Entity Fraud Defendants aiding and abetting the Individual Fraud Defendants' breaches of fiduciary duty, plaintiffs have sustained and continue to sustain significant damages.  As a result of the misconduct alleged herein, the Entity Fraud Defendants are jointly and severally liable to the Company for damages in an amount to be determined by the trier of fact, but no less than $5 million.

SEVENTH CAUSE OF ACTION
(By Plaintiffs Against the Defendants for Unjust Enrichment)

111.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 110 above, as if the same were fully set forth herein.

112.    Plaintiffs bring this cause of action directly against the defendants for unjust enrichment.

31

113.    As set forth above, the defendants engaged in a common plan and scheme to perform the Fraudulent Conveyance and usurp plaintiffs' share ownership rights and beneficial interest in the Company.

114.    Defendants were unjustly enriched by their misconduct at plaintiffs' expense.

115.    As a direct and proximate result of the defendants' unjust enrichment, plaintiffs have sustained and continue to sustain significant damages.  As a result of the misconduct alleged herein, the defendants are jointly and severally liable to plaintiffs for damages in an amount to be determined by the trier of fact, but no less than $5 million.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Awarding compensatory damages in favor of the Company and against defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon.

B.    Awarding compensatory damages in favor of plaintiffs and against defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon.

C.    Awarding plaintiffs their costs and expenses incurred in this action, including attorneys' fees.

D.    Awarding plaintiffs such other and further relief as the Court may deem just and proper.

Dated: New York, New York
~~August~~ 12, 2012
September

32

GUSRAE KAPLAN NUSBAUM PLLC

By:_____
        David S. Frydman (df 8095)
        Lawrence G. Nusbaum
Attorneys for Plaintiffs
120 Wall Street
New York, NY 10005
(212) 269-1400

Republic of Italy
Province of Milan
City of Milan                    } SS
Consulate General of the
United States of America

### VERIFICATION

MARCO ARESE, being duly sworn, deposes and says:

    I am a principal of plaintiffs Casville Investments, Ltd., MBC Investment, SA and Watkins International, Ltd. and authorized by such entities to make this verification. I have read the foregoing Verified Complaint and believe the contents thereof to be true to the best of my own knowledge, information, and belief. The sources of my information and grounds for my belief are my personal knowledge and the files of plaintiffs Casville Investments, Ltd., MBC Investment, SA and Watkins International, Ltd.

MARCO ARESE LUCINI

Sworn to before me this
_____ day of _____, 2012.

1 1 SEP 2012

Notary Public

**JOAN E. KANE**
Consul of the
United States of America

## COMMISSION:
## INDEFINITE

34

